FILED
CLERK, U.S. DISTRICT COURT

AUG 2 4 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ALBERT VICTOR WHITE,                )    NO. CV 09-3211-PSG(E)
                                    )
            Petitioner,             )
                                    )
    v.                              )    ORDER ADOPTING FINDINGS,
                                    )
YATES, Warden,                      )    CONCLUSIONS AND RECOMMENDATIONS
                                    )
            Respondent.             )    OF UNITED STATES MAGISTRATE JUDGE
                                    )
_____)


        Pursuant to 28 U.S.C. section 636, the Court has reviewed the

Petition, all of the records herein and the attached Report and

Recommendation of United States Magistrate Judge.  The Court approves

and adopts the Magistrate Judge's Report and Recommendation.


        IT IS ORDERED that Judgment be entered denying and dismissing

the Petition with prejudice.

///

///

///

///

1       IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2  the Magistrate Judge's Report and Recommendation and the Judgment

3  herein by United States mail on Petitioner, and counsel for

4  Respondent.

5

6       LET JUDGMENT BE ENTERED ACCORDINGLY.

7

8       DATED: _____8/24_____, 2010.

9

10

11       _____

            PHILIP S. GUTIERREZ

12      UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| ALBERT VICTOR WHITE, | ) | NO. CV 09-3211-PSG(E) |
| Petitioner, | ) | |
| v. | ) | REPORT AND RECOMMENDATION OF |
| YATES, Warden, | ) | UNITED STATES MAGISTRATE JUDGE |
| Respondent. | ) | |

        This Report and Recommendation is submitted to the Honorable Philip S. Gutierrez, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05-07 of the United States District Court for the Central District of California.

**PROCEEDINGS**

        Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on May 7, 2009, with attached handwritten pages purportedly listing 45 grounds for relief ("Pet. Att."), and Exhibits ("Pet. Ex."). Respondent filed an Answer on January 7, 2010,

and lodged multiple documents in support of the Answer ("Respondent's Lodgment"). On June 9, 2010, Petitioner filed a Reply. On June 24, 2010, Petitioner filed a second Reply. Petitioner filed a third Reply on June 28, 2010. Petitioner filed a fourth Reply on July 6, 2010.

## BACKGROUND

On October 30, 2002, a jury found Petitioner guilty of the second degree murder of his father (Clerk's Transcript ["C.T."] 291). The jury found true the allegation that, in committing the murder, Petitioner personally used a deadly weapon, a blunt object, within the meaning of California Penal Code section 12022(b)(1) (C.T. 291).

On or about March 21, 2005, Petitioner, then proceeding pro se, filed a "summary" motion for a new trial (C.T. 355-62). This motion alleged that the Superior Court should order a new trial based on: (1) missing portions of the trial transcript; (2) purported ineffective assistance of trial counsel; (3) purported prosecutorial misconduct; (4) assertedly improper jury contact by the investigating police officer; (5) asserted jury instruction error; (6) asserted jury error in returning a verdict purportedly contrary to law and the evidence; (7) Petitioner's purported incompetence to stand trial; and (8) purportedly "new" (but unspecified) evidence of Petitioner's actual innocence (C.T. 355-62). On or about April 1, 2005, Petitioner filed a Petition for Writ of Prohibition/Mandate and Stay of Proceedings with the Court of Appeal, seeking to stay sentencing while Petitioner appealed the trial court's (anticipated) denial of his motion for a new trial based on the missing portions of the trial

1  transcript (C.T. 331-39, 363).  The Court of Appeal summarily denied

2  the petition on April 4, 2005 (Pet. Ex. 29).  On April 4, 2005, the

3  trial court denied Petitioner's "summary" motion for a new trial, and

4  sentenced Petitioner to 15 years to life in prison, plus one year for

5  the weapon allegation (C.T. 363-66; R.T. 12609, 12619).[1]

6

7      The Court of Appeal affirmed the judgment in a reasoned decision.

8  See People v. White, 2006 WL 3517752 (Cal. App. Dec. 7, 2006), lodged

9  as Respondent's Lodgment 6; see also Respondent's Lodgments 3-5

10 (briefing).  The California Supreme Court denied Petitioner's petition

11 for review summarily (see Respondent's Lodgments 7, 8).  Petitioner

12 filed a lengthy habeas corpus petition in the Superior Court asserting

13 the claims herein, which that court denied in a reasoned decision on

14 June 16, 2008 (Respondent's Lodgments 9, 10).  The Court of Appeal and

15 California Supreme Court summarily denied Petitioner's habeas

16 petitions filed in those courts (see Respondent's Lodgment 6 at n.1

17 (noting denial of a habeas petition considered concurrently with

18 Petitioner's direct appeal), 11, 12, 13, 14).

19

20                       **SUMMARY OF TRIAL EVIDENCE**

21

22      The following summary is taken from the opinion of the California

23 Court of Appeal in People v. White, 2006 WL 3517752 (Cal. App. Dec. 7,

24 2006) (footnotes original).  See Slovik v. Yates, 556 F.3d 747, 749

25 _____

26      [1]   At sentencing, Petitioner stated that he was "actually,
   factually and legally innocent," claimed that a "third party"
27 committed the crime, and asserted that this "third party" had
   threatened Petitioner, allegedly causing Petitioner to make
28 incriminating admissions (R.T. 12610, 12612-17).

                                3

1  n.1 (9th Cir. 2009) (taking factual summary from state appellate

2  decision); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("a determination of a

3  factual issue made by a State court shall be presumed to be correct");

4  Respondent's Lodgment 6 (copy of opinion).

5

6  <center>**The Prosecution's Evidence**</center>

7

8  **The Crime Scene**

9

10  . . . On February 5, 2002, shortly after 8:00 p.m., Santa Monica

11  police officers[] responded to a 9-1-1 call at 954 21st Street,

12  unit A, in Santa Monica. Officer Ken Semko was the first to locate

13  [Petitioner's] apartment. He remained outside because of information

14  that guns were present.

15

16  When the door to unit A opened, Officer Semko instructed

17  [Petitioner] to step outside with his hands up. [Petitioner]

18  complied. He had no blood on him or any apparent injuries and was not

19  crying. In a clear, calm voice, he told Officer Semko, "'It's bad.

20  It's real bad. I killed my dad.'" Another officer transported

21  [Petitioner] to the police station.

22

23  When officers entered the apartment, they found an elderly man,

24  determined to be Pranas Brazinskas (Brazinskas), in a small bedroom,

25  slumped over the bed, face down in the center of the bed, knees on the

26  ground. He was not breathing, appeared blue, and his feet were

27  bruising. Brazinskas evidenced trauma to the left side and back of

28  his head and had a "defensive wound" to his left index finger. On the

<center>4</center>

1   floor, within his reach was a handgun.   A red tote bag containing

2   firearms was three or four feet from the body.   The apartment was

3   orderly and did not appear as if a struggle had taken place.

4

5       There was a large quantity of blood on the bed by Brazinskas'

6   head.   The blood spatter tended to be in higher locations in the room,

7   including on the wall, just above Brazinskas' head.   There was also

8   blood on numerous objects in the room, but not on the guns in the tote

9   bag, gun boxes or ammunition, on the gun found next to Brazinskas or

10   on any dumbbell.   In the adjoining bathroom, there were blood-stained

11   pillows and bedding in the tub, which had blood smearing, but no blood

12   spatter on it.   Blood was not found in any other room.   Detectives

13   found several dumbbells in the living room, none in Brazinskas'

14   bedroom.[2]

15

16       The red tote bag contained four fully loaded guns, each with a

17   chambered round ready to be fired.   The handgun on the floor next to

18   Brazinskas, a Tenfaglio .32-caliber pistol, had one round in the

19   magazine, but no chambered round.   Investigators could not find

20   registration information with respect to that gun.   None of the other

21   guns were registered to Brazinskas, but a .38-caliber gun was

22

23

24

25   _____

26       [2]   After notice that the crime scene investigation was
     complete, Donatas Jasiulionis (Donatas), Brazinskas' grandson,
27   disposed of the contents of the apartment.   When Detective John
     Henry contacted him to attempt to retrieve one of the dumbbells
28   that was in the apartment, he was told they had been given away.

1   registered to [Petitioner].[3]  Detectives found no evidence that any of

2   the guns had been discharged in the apartment, and the gun near

3   Brazinskas had not been recently fired.

4

5        After the police secured the apartment, a City of Santa Monica

6   paramedic entered.  He observed that Brazinskas had a drying, bloody

7   mass on the back of his head, his blood had begun to pool, and his

8   body showed signs of rigor mortis.  At 8:25 p.m., he declared

9   Brazinskas dead, and opined that the actual time of death was a couple

10  of hours earlier.

11

12       Between 10:00 and 11:00 a.m., on February 5, 2002, John

13  Margravee, [Petitioner's] neighbor, saw [Petitioner] place black

14  garbage bags in the garbage dumpster in the alley.  Margravee told

15  Keith Floria, Brazinskas' upstairs neighbor, what he had seen.  The

16  two men looked into the dumpster, removed and opened a few black

17  garbage bags.  Inside one were linens and men's underwear.  Margravee

18  saw what appeared to be blood on one of the sheets, and, later that

19  evening, told the police what he had seen.

20

21       Detective Gary Steiner and Detective Henry searched for a murder

22  weapon.  It was never recovered.  Detective Steiner also searched for

23  the bloody clothing in the dumpster and elsewhere.  While he found

24  trash bags in the dumpster that contained linens and clothing, it did

25

26  _____

27       [3]   [Petitioner] testified in defense that the weapon

28  registered in his name was bought for Brazinskas who believed the
    KGB was trying to get him.

6

1   not appear that the items inside had any blood on them.[4]

2

3     From the evidence at the scene, Detective Steiner concluded that

4 the crime scene had been staged or altered.  The blood spatter was not

5 close enough to the body.  The pillows and bedding in the tub were

6 soaked with blood, but there was no spatter there to indicate that the

7 wounds were inflicted there.  The handgun near the victim had no blood

8 on it, and [Petitioner] had no blood on him.  The victim's defensive

9 wound suggested he was not holding a gun because the gun did not have

10 blood on it.  Further, the crime scene was inconsistent with a

11 struggle having occurred as there were no broken or overturned objects

12 in the room.  The spatter placement suggested that the body had been

13 moved from where the wounds were inflicted.  Detective Steiner also

14 learned that the kitchen blinds were usually left open, and

15 [Petitioner] and Brazinskas were often observed by a neighbor through

16 the window.  On the day of the murder, the curtains were drawn.

17

18 **The Forensic Investigation**

19

20     **Autopsy**

21

22     Stephen Scholtz, a deputy medical examiner with the Coroner's

23 Office, performed an autopsy on 77-year-old Brazinskas.  He found that

24 Brazinskas was a small man, in fragile health.  He was chronically ill

25 and a non-active person, with serious heart disease.  Given his

26 _____

27    [4]   While this appears to be Detective Steiner's testimony,
omissions in the transcript make it impossible to conclude this
28 with certainty.

7

1   physical condition, Scholtz found it unlikely that at the time of his

2   death Brazinskas would have been able to engage in physical

3   activities.[5]

4

5       Scholtz found seven laceration wounds to Brazinskas' head, with

6   compression fractures to the skull associated with five of the wounds,

7   which he opined were caused by a blunt object.  He concluded that

8   Brazinskas was murdered by the use of blunt force trauma to the head.

9   The severity of the wounds indicated that one of them would definitely

10   have rendered Brazinskas unconscious, four others were sufficient to

11   do so, and two were unlikely to have done so.

12

13   **Gunshot Residue Tests (GSR)**

14

15       GSR tests were performed on [Petitioner] and on Brazinskas.

16   Gunshot residue was found on both hands of each man.  The residue

17   could only have gotten on them by firing a weapon, being in close

18   proximity to the firing of a weapon, handling a weapon that had been

19   fired, or by being transferred from a person who had residue on him.

20   A thorough hand washing would eliminate all or most of the residue.

21   ///

22   ///

23   ///

24   ────────────────────

25       [5]    The Coroner's findings regarding Brazinskas' health were corroborated by Brazinskas' personal physician, Dr. Stanley

26   Hubbard.  Dr. Hubbard confirmed that Brazinskas had serious heart problems and that, in March of 2002, Brazinskas broke his kneecap

27   riding his bicycle, and had a compression fracture in his lower back from November of 2001.  He also indicated that Brazinskas

28   had urinary incontinence and was on prescriptive oxygen.

**Fingerprints**


No latent prints were obtained from the Tenfaglio handgun found near Brazinskas.  No effort was made to obtain fingerprints from the gun's magazine.


**Blood Spatter Evidence**


On February 25, 2002, Robert Keil, a senior criminalist with the Los Angeles County Sheriff's Department, conducted a blood spatter analysis, allowing him to determine the victim's position when the impact causing the spatter occurred.  Keil opined that it was impossible for Brazinskas to have been in the position in which he was found when his wounds were incurred.


**Blood Tests**


No blood was visually found on [Petitioner's] outer clothing by the arresting officer.  However, his socks and T-shirt tested positive for human blood.  A section of the carpet in Brazinskas' room was tested and found positive for human blood.  The blood was not typed to determine whose it was.  The Tenfaglio handgun was found not to have blood on it.

///
///
///
///
///

9

**The Defense's Evidence**

**Brazinskas' Violent History**

[Petitioner], a certified public accountant born in Lithuania, testified on his own behalf, describing numerous incidents reflecting Brazinskas' violent nature.  These included Brazinskas twice being jailed for theft, embezzlement and resisting arrest in Lithuania, threatening to blow up the Lithuanian courthouse to destroy his court files, assaulting [Petitioner's] pregnant mother causing the death of the child, beating [Petitioner] and his mother, taking a knife to his brother-in-law, attacking another brother-in-law with an iron, taking an axe to Brazinskas' mother to coerce her to sign papers, holding a knife to [Petitioner's] neck to hold off Lithuanian police, taking [Petitioner] with him in 1970, when he hijacked a plane to escape the Soviet Union, shot and killed a stewardess, and shot both pilots, killing one of them, threatening [Petitioner's] mother-in-law with a knife and threatening to stab [Petitioner] when he tried to stop him, threatening to kill and assaulting [Petitioner] on numerous occasions, throwing stones at neighbors' children playing and threatening to kill a neighbor and her handyman, resulting in the neighbor having him placed on a 72-hour hold.

Stanislava Jankauskiene, [Petitioner's] sister, testified that she was present in 1992 when her father pointed a pistol at [Petitioner] and told him he was no good and that he could shoot him, lowering the gun only when [Petitioner] left the house.

///

**The Charged Incident**

[Petitioner] testified that Brazinskas was physically fit and rode his bicycle until the day he died. Nonetheless, in December 2001, [Petitioner] filled out and signed a hospital form for Brazinskas, who could not speak English, stating that, "I can only walk using a stick or crutches." [Petitioner] claimed that oxygen tanks in the apartment were for "rejuvenation."

In the weeks before his death, Brazinskas became increasingly depressed and suicidal, preparing a will and writing suicide notes. [Petitioner] suggested he see a psychiatrist. Brazinskas pulled a knife on [Petitioner], told him he was not crazy, and that he would kill [Petitioner] if he talked about it. A few days before the murder, [Petitioner] told Brazinskas that he had remarried Virginia, his second wife. Brazinskas became upset and said, "'You betrayed me. . . . I should have killed you a long time ago.'"

Between 10:00 a.m. and 4:00 p.m., on February 5, 2002, [Petitioner] was packing to leave Brazinskas due to concern for his safety. He brought trash bags to the garbage, containing linens and things he no longer needed. There were no bloody clothes.

At approximately 6:00 p.m., when [Petitioner] was about to step into the shower Brazinskas called him from his bedroom and angrily said, "'Come here right away. This is an emergency.'" [Petitioner] went to his father's room where his father pointed a pistol at him, and said, "'I'm going to shoot you, you son of a bitch.'"

11

1    [Petitioner] jumped toward Brazinskas and fell to his hands and

2    knees.  Brazinskas leaned over him with the gun.  [Petitioner] tried

3    to grab the gun.  He felt something heavy on the floor and struck his

4    father with it.  Brazinskas would not drop the gun, so [Petitioner]

5    repeatedly struck him until he did so.  [Petitioner] then dropped the

6    object.  Brazinskas turned and fell face down on the pillows on the

7    bed.

8

9    [Petitioner] claimed his immediate concern was to help his

10   father, entreating him to "Get up, Get up."  He looked down and saw

11   that he had hit Brazinskas with a small dumbbell that was in

12   Brazinskas' room.[6]  Fearing that his father could not breathe with the

13   pillows under him, [Petitioner] put them in the bathtub. He did not

14   immediately call the police or paramedics because he was in shock and

15   suicidal.  He ran into the bathroom and wanted to "smash [his] own

16   head with [a dumbbell]."  He had all of the water running preparing to

17   do so, but could not.  He sat naked in the bathtub with the dumbbell.

18   He thought about using a gun to kill himself, but he never liked guns

19   and did not want to die by a gunshot.  [Petitioner's] wife called and

20   told him not to kill himself.  [Petitioner] called Donatas and asked

21   him to come over.  He told him he accidentally killed Brazinskas in

22   self-defense.

23

24   At 8:00 p.m., [Petitioner] first called 9-1-1 and hung up.  His

25   wife called him back and told him to call 9-1-1, and he called again.

26   He told the dispatcher that his father wanted to kill him, and he

27   _____

28   [6]   [Petitioner] later told a 911 operator that he did not
     know what he hit Brazinskas with.

12

1   defended himself, accidentally killing his father.  She told him to

2   walk to the door, raise his hands and walk outside, which he did.

3   When he got outside, he told the police officer he had killed his

4   father.

5

6       Donatas testified that he went to dinner with Brazinskas four

7   days before his death.  Brazinskas walked normally.  Donatas never saw

8   his grandfather with an oxygen tank, and he seemed in good physical

9   condition for his age.  At 7:30 p.m., Donatas received a call from

10  [Petitioner] who told him that Brazinskas tried to kill him, and he

11  defended himself.  Donatas went to his apartment.

12

13      Donatas arranged for the cremation and burial of Brazinskas and

14  cleaned out his apartment, giving his clothes to charity.  Among

15  Brazinskas' possessions were many knives.  There was also a suicide

16  note written by his grandfather in Lithuanian.  When first called on

17  direct examination, Donatas testified that he did not recall seeing

18  dumbbells or what he may have done with them.  When later recalled to

19  the stand, Donatas said that when he cleaned out the apartment, there

20  were dumbbells in his grandfather's room, near the bed.  Donatas gave

21  most of them away to the Salvation Army and threw out others.

22

23                    **Prosecution's Rebuttal Evidence**

24

25      Steven LaRoche, an investigator in the district attorney's

26  office, was present at Donatas' interview on August 28, 2005.  In the

27  interview, Donatas stated that he had seen dumbbells in his

28  grandfather's apartment, but had never seen [Petitioner] or Brazinskas

1  using them.   Donatas was shown a document in Lithuanian and said he
2  did not recognize the handwriting.

3

4       When Keil was in Brazinskas' bedroom, he was looking for any
5  object that could have been used as a weapon.   He moved the bed and
6  did not see any dumbbells or other such objects.   He opined that
7  Brazinskas could not have been struck where [Petitioner] claimed to
8  have struck him because that was inconsistent with the blood spatter
9  evidence.   He also indicated that his blood spatter analysis could be
10 duplicated and the results corroborated.

11

12      The prosecutor played a tape recording of an interview of
13 [Petitioner] by Detective Henry.   In it, [Petitioner] claimed that
14 "what happened was self-defense," but said he did not remember if he
15 hit Brazinskas.   He said that when Brazinskas called him into the
16 bedroom, he was in the kitchen washing dishes.

17

18                          **The Defense's Surrebuttal**

19

20      [Petitioner] claimed to have been in shock when he told Detective
21 Henry that he was washing dishes in the kitchen when called into his
22 father's room.

23

24                          **PETITIONER'S CONTENTIONS**

25

26      Petitioner contends:
27 ///
28 ///

14

1    1.    Petitioner assertedly is "actually innocent" (Petition,
2    Grounds 7, 10);

3

4    2.    Petitioner's incriminating statements made to the police
5    shortly after his father's killing assertedly: (a) were involuntarily
6    made, due to the alleged coercion from a "third party," and should not
7    have been introduced at trial (Petition, Grounds 8, 9, 13); and
8    (b) were made without <u>Miranda</u> warnings,[7] and should not have been
9    introduced at trial (Petition, Grounds 14, 15);

10

11    3.    Petitioner assertedly was incompetent to stand trial
12    (Petition, Ground 25);

13

14    4.    The trial judge allegedly erred by assertedly:

15

16          (a)   allowing an ill court reporter to record Petitioner's
17                trial proceedings for five days, resulting in a "loss
18                or damage of extensive and crucially important portions
19                of the trial record" (Petition, Grounds 32, 33, 34);

20

21          (b)   requiring Petitioner to testify prior to the testimony
22                of other defense witnesses, which allegedly forced
23                Petitioner to testify (Petition, Ground 31);

24

25          (c)   denying Petitioner's motion for a new trial (Petition,
26                Ground 35);

27    _____

28    [7]    See <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)
      ("<u>Miranda</u>").

1           (d)   denying Petitioner's motions made at sentencing

2                  (Petition, Ground 36); and

3

4           (e)   failing to sentence Petitioner within 20 days of the

5                  verdict (Petition, Ground 37);

6

7      5.   The trial judge allegedly was biased against Petitioner

8 (Petition, Grounds 31 through 37);

9

10      6.   Petitioner's counsel allegedly rendered ineffective

11 assistance by assertedly:

12

13           (a)   failing to communicate Petitioner's alleged acceptance

14                  of the prosecution's supposed pre-trial plea bargain

15                  offer, and otherwise allegedly misadvising Petitioner

16                  concerning Petitioner's potential sentence and

17                  assertedly pressuring Petitioner to reject plea offers

18                  (Petition, Grounds 1, 2);

19

20           (b)   having a conflict of interest with Petitioner

21                  (Petition, Ground 3);

22

23           (c)   being physically and mentally unable to provide

24                  competent representation (Petition, Grounds 4, 5);

25

26           (d)   based on the allegations in Grounds 1 through 5, being

27                  "ineffective, incompetent, hostile, counterproductive

28                  to Petitioner's best interests, and in fact aiding the

1    prosecution's case, that the trial was fundamentally

2    unfair and amounted to a guilty plea" (Petition, Ground

3    6);

4

5    (e)   failing to investigate and present evidence relating

6          to the allegedly guilty "third party" (Petition,

7          Ground 11);

8

9    (f)   failing to suppress Petitioner's allegedly coerced

10         statements (Petition, Grounds 12, 14, 17);

11

12   (g)   telling Petitioner and Petitioner's family members what

13         to say (Petition, Grounds 16, 18, 22);

14

15   (h)   presenting a defense based on self-defense but

16         allegedly failing to address the prosecution's specific

17         charges, claims, theories and allegations (Petition,

18         Grounds 17, 19, 20, 23, 27);

19

20   (i)   failing to present expert witnesses to counter the

21         prosecution's experts (Petition, Ground 21);

22

23   (j)   forcing Petitioner to stand trial when counsel

24         supposedly knew that Petitioner was incompetent to

25         stand trial (Petition, Ground 26);

26

27   (k)   failing to object to the presence of Detective Henry as

28         the investigating officer at trial, while Detective

Henry allegedly intimidated Petitioner and influenced the jury with "intentional, suggestive, prejudicial gestures and facial expressions" (Petition, Ground 28);

(1) failing to move for a mistrial upon learning that Detective Henry allegedly had made deliberate physical contact with the seated jurors, assertedly discussing matters relating to Petitioner's trial during recesses in courtroom hallways and restrooms (Petition, Ground 29);

(m) failing to attend a readback and failing to answer the jury's questions (Petition, Grounds 27, 30);

(n) failing adequately to represent Petitioner's interests after Petitioner's conviction and prior to sentencing (Petition, Grounds 37 through 43);

7. The cumulative effect of the errors specified above allegedly deprived Petitioner of a fair trial (Petition, Ground 24);

8. Petitioner's appellate counsel allegedly rendered ineffective assistance by assertedly failing to raise "many appealable issues" including alleged judicial bias, ineffective assistance of trial counsel, and actual innocence (Petition, Ground 44); and

9. The California Court of Appeal allegedly erred in denying Petitioner's repeated letters and motions to dismiss Petitioner's

1  purportedly ineffective appellate counsel or to allow Petitioner to

2  represent himself on appeal (Petition, Ground 45).

3

4  **STANDARD OF REVIEW**

5

6       A federal court may not grant an application for writ of habeas

7  corpus on behalf of a person in state custody with respect to any

8  claim that was adjudicated on the merits in state court proceedings

9  unless the adjudication of the claim: (1) "resulted in a decision that

10  was contrary to, or involved an unreasonable application of, clearly

11  established Federal law, as determined by the Supreme Court of the

12  United States"; or (2) "resulted in a decision that was based on an

13  unreasonable determination of the facts in light of the evidence

14  presented in the State court proceeding." 28 U.S.C. § 2254(d);

15  Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v. Packer,

16  537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

17

18       "Clearly established Federal law" refers to the governing legal

19  principle or principles set forth by the Supreme Court at the time the

20  state court renders its decision. Lockyer v. Andrade, 538 U.S. 63

21  (2003). A state court's decision is "contrary to" clearly established

22  Federal law if: (1) it applies a rule that contradicts governing

23  Supreme Court law; or (2) it "confronts a set of facts. . . materially

24  indistinguishable" from a decision of the Supreme Court but reaches a

25  different result. See Early v. Packer, 537 U.S. at 8 (citation

26  omitted); Williams v. Taylor, 529 U.S. at 405-06.

27  ///

28  ///

19

1    Under the "unreasonable application prong" of section 2254(d)(1),

2  a federal court may grant habeas relief "based on the application of a

3  governing legal principle to a set of facts different from those of

4  the case in which the principle was announced." <u>Lockyer v. Andrade</u>,

5  538 U.S. at 76 (citation omitted); <u>see also</u> <u>Woodford v. Visciotti</u>,

6  537 U.S. at 24-26 (state court decision "involves an unreasonable

7  application" of clearly established federal law if it identifies the

8  correct governing Supreme Court law but unreasonably applies the law

9  to the facts).

10

11    A state court's decision "involves an unreasonable application of

12  [Supreme Court] precedent if the state court either unreasonably

13  extends a legal principle from [Supreme Court] precedent to a new

14  context where it should not apply, or unreasonably refuses to extend

15  that principle to a new context where it should apply." <u>Williams v.</u>

16  <u>Taylor</u>, 529 U.S. at 407 (citation omitted).

17

18    "In order for a federal court to find a state court's application

19  of [Supreme Court] precedent 'unreasonable,' the state court's

20  decision must have been more than incorrect or erroneous." <u>Wiggins v.</u>

21  <u>Smith</u>, 539 U.S. 510, 520 (2003) (citation omitted). "The state

22  court's application must have been 'objectively unreasonable.'" <u>Id.</u>

23  at 520-21 (citation omitted); <u>see also</u> <u>Waddington v. Sarausad</u>, 129 S.

24  Ct. 823, 831 (2009); <u>Davis v. Woodford</u>, 384 F.3d 628, 637-38 (9th Cir.

25  2004), <u>cert. dism'd</u>, 545 U.S. 1165 (2005). In applying these

26  standards, the Court looks to the last reasoned state court decision.

27  <u>See</u> <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008). Where

28  no such reasoned opinion exists, as where a state court rejected a

1  claim in an unreasoned order, this Court must conduct an independent

2  review to determine whether the decisions were contrary to, or

3  involved an unreasonable application of, "clearly established" Supreme

4  Court precedent.  See Matylinsky v. Budge, 577 F.3d 1083, 1090 (9th

5  Cir. 2009), cert. denied, 130 S. Ct. 1154 (2010).  If the state courts

6  did not decide a federal constitutional issue on the merits, this

7  Court must consider that issue under a de novo standard of review.

8  See Lewis v. Mayle, 391 F.3d 989, 996 (9th Cir. 2004); see also Porter

9  v. McCollum, 130 S. Ct. 447, 452 (2009) (reviewing Strickland claim de

10 novo where state court did not decide whether petitioner's counsel was

11 deficient).

12

13                              **DISCUSSION**

14

15      For the reasons discussed below, the Petition should be denied

16 and dismissed with prejudice.[8]

17

18 I.  **Petitioner's Actual Innocence Claim Does Not Merit Habeas Relief.**

19

20      In Grounds 7 and 10, Petitioner alleges a "third party" killed

21 his father (i.e., the "Los Angeles Russian Mafia Group, led by Iouri

22 Mikhel and Jurijus Kadamovas"), and that this "third party"

23 "continuous[ly] intimidat[ed]" Petitioner, forcing Petitioner to take

24 the blame for killing Petitioner's father (Pet. Att. 41, 44-46, 59).

25 Petitioner alleges that the "third party" prevented Petitioner from

26 _____

27      [8]   The Court has read, considered and rejected on the

28 merits all of Petitioner's contentions.  The Court discusses Petitioner's principal contentions herein.

21

1 | disclosing the identity of his father's killers during trial by
2 | threats to Petitioner's extended family and relatives (Pet. Att. 59;
3 | but see Ground 11 (Petitioner alleges that he did disclose the "third
4 | party" story to Petitioner's trial counsel, but trial counsel
5 | supposedly refused to investigate or present evidence about the
6 | Russian Mafia's alleged involvement); Ground 17 (same)).  To the
7 | extent Petitioner is asserting an "actual innocence" claim, Petitioner
8 | is not entitled to habeas relief.
9 |
10 |     Petitioner alleges that on the day of the killing, armed members
11 | of the Russian Mafia invaded Petitioner's home, demanding money and
12 | other valuables (Pet. Att. 44).  Petitioner alleges that his father
13 | was forced to the bedroom to retrieve valuables, but grabbed a gun and
14 | tried to defend himself (Pet. Att. 44).  Petitioner alleges that one
15 | of the invaders beat Petitioner's father to death while another
16 | invader held Petitioner at gunpoint (Pet. Att. 44-45).  Petitioner
17 | alleges that after the invaders killed his father, they "threatened,
18 | terrorized and tortured" Petitioner until he surrendered his valuables
19 | to them (Pet. Att. 45; see also Pet. Ex. 8, p. 19 (containing similar
20 | allegations)).[9]
21 |
22 |     Petitioner raised these allegations with the trial court in a
23 | motion for new trial and in comments on oral motions to the trial
24 | court before sentencing (Pet. Ex. 5 (motion); R.T. 12610, 12613-17;
25 |
26 | _____
27 |     [9]   The responding police officer who was present when
   | Petitioner's clothes were taken for booking testified that he
   | observed no blood on Petitioner and no injuries to Petitioner
28 | (R.T. 704-05).

1    <u>see also</u> Pet. Ex. 4 (Petitioner's "affidavit" containing similar

2    allegations)).   The trial court denied Petitioner's motions (R.T.

3    12610-19).   Petitioner also raised these allegations in a "Petition

4    for Writ of Error Coram Nobis/Vobis" filed with the Court of Appeal on

5    June 21, 2005 (Pet. Ex. 8).   The Court of Appeal denied the petition

6    without comment.  <u>See</u> Pet. Ex. 30.   Petitioner requests an evidentiary

7    hearing (Pet. Att. 48).

8

9        "To be credible, [a claim of actual innocence] requires

10   petitioner to support his allegations of constitutional error with <u>new</u>

11   <u>reliable</u> evidence – whether it be exculpatory scientific evidence,

12   trustworthy eyewitness accounts, or critical physical evidence – that

13   was not presented at trial.   Because such evidence is obviously

14   unavailable in the vast majority of cases, claims of actual innocence

15   are rarely successful."  <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995)

16   (emphasis added); <u>see also</u> <u>House v. Bell</u>, 547 U.S. 518, 536-37 (2006)

17   (discussing same).   A petitioner "must show that it is more likely

18   than not that no reasonable juror would have convicted him in light of

19   the new evidence."  <u>Schlup v. Delo</u>, 513 U.S. at 327.

20

21        To support Petitioner's allegations that Russian Mafia members

22   killed his father and forced Petitioner to take the blame, Petitioner

23   has submitted copies of a post-conviction letter Petitioner allegedly

24   wrote to a Superior Court judge in 2008, a 2008 declaration by

25   Petitioner, and the 2005 declaration by Petitioner.  <u>See</u> Pet. Ex. 1,

26   p. 11; Pet. Ex. 4; Pet. Ex. 8, pp. 27-52.   None of this purported

27   "evidence" is the kind of new and reliable evidence that would

28   demonstrate "it is more likely than not that no reasonable juror would

1 have convicted him in light of the new evidence." <u>See</u> <u>Schlup v. Delo</u>,

2 513 U.S. at 324; <u>House v. Bell</u>, 547 U.S. at 537; <u>see also</u> <u>Herrera v.</u>

3 <u>Collins</u>, 506 U.S. 390, 423 (1993) (O'Connor, J. concurring) (post-

4 trial affidavits "are to be treated with a fair degree of

5 skepticism"); <u>Baran v. Hill</u>, 2010 WL 466153, at *7 (D. Or. Feb. 9,

6 2010) (finding that petitioner's self-serving and unsupported

7 statements were not "new and reliable" evidence sufficient to prove

8 actual innocence); <u>McArdle v. Sniff</u>, 2009 WL 1097324, at *5 (C.D. Cal.

9 Apr. 20, 2009) (same); <u>Porter v. Adams</u>, 2007 WL 2703195, at *9 (E.D.

10 Cal. Sept. 14, 2007) (finding "new" evidence unreliable to support

11 actual innocence claim, where petitioner had "simply provided his own

12 self-serving declaration, corroborated by declarations from his cousin

13 and his cousin's cousin," dated five years after petitioner's

14 conviction).   Petitioner has not made a credible claim of actual

15 innocence.[10]

16

17     Moreover, even if Petitioner's evidence were sufficiently "new

18 and reliable" to establish a credible claim under <u>Schlup</u>, the Supreme

19 Court has never recognized a freestanding claim of actual innocence

20 based on newly discovered evidence in a non-capital case.  "Claims of

21 actual innocence based on newly discovered evidence have never been

22 held to state a ground for federal habeas relief absent an independent

23 constitutional violation in the underlying state proceeding."  <u>Herrera</u>

24 _____

25

26     [10]     Petitioner's request for an evidentiary hearing is
denied.  <u>See</u> <u>Gandarela v. Johnson</u>, 286 F.3d 1080, 1087 (9th Cir.
2001), <u>cert. denied</u>, 537 U.S. 1117 (2003) (evidentiary hearing

27 properly denied where the petitioner "failed to show what more an
evidentiary hearing might reveal of material import on

28 [petitioner's] assertion of actual innocence").

1  v. Collins, 506 U.S. at 400; see District Attorney's Office v.

2  Osborne, 129 S. Ct. 2308, 2321 (2009) (whether there exists a "federal

3  constitutional right to be released upon proof of 'actual innocence'"

4  is "an open question"); House v. Bell, 547 U.S. at 554-56 (declining

5  to decide whether federal habeas courts may consider a freestanding

6  actual innocence claim in capital case); but see In re Davis, 130 S.

7  Ct. 1 (2009) (transferring capital habeas petition to district court

8  for hearing on petitioner's actual innocence claim).   Thus,

9  Petitioner's claim of actual innocence cannot warrant federal habeas

10 relief.   See 28 U.S.C. § 2254(d).

11

12       For the foregoing reasons, the state courts' denial of

13 Petitioner's actual innocence claim was not contrary to or an

14 unreasonable application of clearly established federal law, or an

15 unreasonable determination of the facts in light of the evidence

16 presented in the state court proceedings.   28 U.S.C. § 2254(d)(2).

17 Grounds 7 and 10 do not warrant federal habeas relief.

18

19 **II.   Petitioner Is Not Entitled to Habeas Relief on His Claims that**

20      **His Incriminating Statements Should Not Have Been Introduced at**

21      **Trial.**

22

23       In Grounds 8, 9, 13, 14, and 15, Petitioner claims that the

24 incriminating statements he made to the police were involuntary and

25 were made in the absence of Miranda advisements.   Petitioner contends

26 that these statements constituted the only incriminating evidence

27 introduced against him.   According to Petitioner, there was no

28 "objectively incriminating physical evidence" and there were no

1  eyewitnesses (Ground 9; Pet. Att. 56).

2

3      **A.    The Trial Evidence Concerning Petitioner's Incriminating**

4            **Statements**

5

6      Responding police officer Ken Semko testified that, when he

7  arrived at Petitioner's apartment complex, he ordered Petitioner out

8  of Petitioner's apartment (R.T. 668-73, 690-91).  Petitioner complied

9  (R.T. 672, 691).  As Petitioner approached Officer Semko, the officer

10 asked what was going on (R.T. 673, 692-93).  Petitioner replied, "It's

11 bad.  It's real bad.  I killed my dad." (R.T. 674, 693).

12

13      Sergeant Steiner, one of the responding police officers who

14 searched Petitioner's apartment, said that he received information

15 about statements Petitioner made to Detective Henry (R.T. 904).

16 Petitioner's counsel, Mr. Alex, asked for a sidebar, and objected to

17 the introduction of any statements Petitioner made to Detective Henry

18 as having been made without Miranda advisements (R.T. 904-05).  The

19 prosecutor said she was not intending to go into Petitioner's

20 statements to Detective Henry (R.T. 905).  Mr. Alex continued with his

21 objection: "there is no advisement of constitutional rights, and I

22 don't find any of that [should come] in, because once [Henry] advised

23 [Petitioner], [Petitioner] understands his rights, [and says] 'I want

24 to talk to an attorney.'" (R.T. 906).  The trial court sustained

25 Mr. Alex's objection (R.T. 906).

26

27      At a later point in trial, the prosecution inquired of the crime

28 scene technician whether the technician asked Petitioner a series of

1    questions relating to gunshot residue tests, including when was the

2    last time Petitioner washed his hands (R.T. 990-91). Mr. Alex

3    objected and asked for a sidebar, where he argued that Petitioner was

4    under arrest at the time of the series of questions, and had not been

5    advised of his Miranda rights (R.T. 991). The trial court agreed and

6    instructed the prosecutor not to ask the technician about Petitioner's

7    statements (R.T. 991-92). Later, after the technician testified that

8    the gunshot residue tests were performed on the night of the incident

9    after Petitioner was taken to the police department, the prosecutor

10    asked for a sidebar and suggested that Petitioner's statements should

11    not be excluded because he assertedly had not yet been arrested at the

12    time of these statements (R.T. 993-94). The trial court disagreed,

13    finding that Petitioner was in custody at the time and was not then

14    free to go (R.T. 994-95). When the prosecutor tried to suggest that

15    Petitioner had voluntarily gone to the police department to give a

16    statement, the trial court said there was no evidence of that

17    happening, and the issue should have been covered in a hearing prior

18    to the start of trial (R.T. 994-95 (stating: "Miranda is an obvious

19    issue. If you have Miranda issues, we should have talked about

20    it.")).

21

22       After Petitioner testified at trial, however, the prosecutor

23    advised the court that she wanted to play the audiotape of

24    Petitioner's interview with Detective Henry, edited to remove those

25    portions where Petitioner denied Detective Henry permission to search

26    Petitioner's apartment (R.T. 2133; see also C.T. 189-212 (transcript

27

28

Case 2:09-cv-03211-PSG-E   Document 50-1   Filed 07/12/10   Page 28 of 100   Page ID #:961

of interview)).[11]   Mr. Alex objected on the ground that the interview

had occurred without a <u>Miranda</u> advisement (R.T. 2180-81).   The trial

court found that Petitioner was in custody for <u>Miranda</u> purposes when

Detective Henry interviewed Petitioner (R.T. 2184, 2402).   However,

the court also found that what remained of the interview after

redacting the search requests was admissible under <u>Harris v. New York</u>,

401 U.S. 222 (1971),[12] to impeach Petitioner's trial testimony (R.T.

2402-04).   The prosecutor later played for the jury the redacted

audiotape of Petitioner's interview with Detective Henry, as well as

the audiotape of Petitioner's 911 call (R.T. 2455-57, 2474-77; <u>see</u>

<u>also</u> C.T. 178-88 (transcript of 911 call)).[13]

///

///

///

_____

[11]   The trial court had ruled that those portions of the
interview in which Petitioner refused consent to search the
apartment were inadmissible (R.T. 2185).

[12]   In <u>Harris</u>, the Supreme Court permitted non-<u>Mirandized</u>
custodial statements to be introduced to impeach the credibility
of a defendant who chose to testify at trial.   <u>Harris v. New</u>
<u>York</u>, 401 U.S. at 223-25.   The defendant in <u>Harris</u> made voluntary
statements to police interrogators prior to being advised of his
<u>Miranda</u> rights.   <u>Harris</u>, 401 U.S. at 223-24.

[13]   Petitioner called 911 to "report an emergency" (C.T.
179).   Petitioner told the operator:

> I – I defended myself against my father who – who
> threatened to shoot me.   And I struck him. . . . I
> think he's injured. . . . I think I struck him with
> something.

(C.T. 179-80).   Petitioner also claimed that his father had tried
to shoot at him because Petitioner wanted to visit Petitioner's
wife in Florida (C.T. 181, 183).

B.    **The Introduction of Petitioner's Incriminating Statements Did Not Violate *Miranda*.**

*Miranda* generally bars the use of statements elicited by custodial interrogation unless the defendant first was informed of his or her constitutional rights. <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (per curiam); <u>Miranda</u>, 384 U.S. at 444.  Here, Petitioner's incriminating statements consisted of: (1) statements Petitioner made when he called 911 and when the police initially ordered Petitioner out of his apartment; and (2) statements Petitioner later made to Detective Henry.

<u>Miranda</u> plainly does not apply to the statements Petitioner made in the 911 call or to Officer Semko as Petitioner emerged from his apartment.  First, Petitioner was not in police custody when he made the call to the 911 operator or the statement to Officer Semko. Second, even if Petitioner had been in custody at the time he told Officer Semko that he killed his father, the public safety exception to <u>Miranda</u> would have permitted the use of this statement at trial. <u>See</u> <u>United States v. Martinez</u>, 406 F.3d 1160, 1165 (9th Cir. 2005) ("<u>Miranda</u> is subject to a narrow 'public safety' exception. . . . In order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" quoting <u>New York v. Quarles</u>, 467 U.S. 649, 659 n.8 (1984)); <u>see also</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 n.10 (1984) ("when the police arrest a suspect under circumstances presenting an imminent danger to the public safety, they may without informing him of his constitutional

1    rights ask questions essential to elicit information necessary to

2    neutralize the threat to the public"); <u>United States v. Doble</u>, 2009 WL

3    567995, at *1 (9th Cir. Mar. 6, 2009), <u>cert. denied</u>, 130 S. Ct. 317

4    (2009) (unpublished decision discussing same).[14]  Officer Semko

5    testified that Petitioner said "I killed my dad" in response to

6    Officer Semko asking "What's going on?" (R.T. 673).  Statements made

7    in response to such safety-related questioning[15] are exempt from

8    <u>Miranda</u>'s protections.  <u>See</u> <u>New York v. Quarles</u>, 467 U.S. at 657 & 658

9    n.7 (finding no <u>Miranda</u> protection for statements given in response to

10   police who, while apprehending a suspect, "were confronted with the

11   immediate necessity of ascertaining the whereabouts of a gun," and

12   noting that "absent actual coercion by the officer [asking the

13   questions], there is no constitutional imperative requiring the

14   exclusion of the evidence that results from police inquiry of this

15   kind").

16

17       The trial court ruled that the statements Petitioner made to

18   Detective Henry were inadmissible in the prosecution's case-in-chief

19   for lack of a <u>Miranda</u> advisement (R.T. 904-06, 2184, 2402).  However,

20   the same statements properly could be introduced for purposes of

21   _____

22       [14]    The Court may cite unpublished Ninth Circuit opinions
     issued on or after January 1, 2007.  <u>See</u> U.S. Ct. App. 9th Cir.
23   Rule 36-3(b) and Fed. R. App. P. 32.1(a).

24       [15]    Officer Semko testified that at that point he and his
25   partner had just arrived at the scene following the 911 call, and
     Petitioner had just exited the apartment at issue with his hands
26   in the air (R.T. 668-73).  Based on the information that dispatch
     had given, Officer Semko knew that there had been some sort of
27   struggle in the apartment and that firearms were involved (R.T.
     673-74).  Officer Semko said he asked, "What's going on?" to
28   determine if there were any immediate dangers (<u>Id.</u>).

impeachment, if the statements were voluntary.  Harris v. New York, 401 U.S. at 223-25; see also Kansas v. Ventris, 129 S. Ct. 1841, 1846 (2009) (applying Harris where the government planted a jailhouse informant to solicit incriminating information from the incarcerated defendant); Oregon v. Elstad, 470 U.S. 298, 307 (1985) (although "unwarned statements" that are otherwise voluntary must be excluded from evidence under Miranda, such exclusion applies only to use by the prosecution in its case-in-chief); Williams v. Stewart, 441 F.3d 1030, 1039-40 (9th Cir. 2006) (denying habeas relief on Miranda claim where the petitioner asserted he did not waive his Miranda rights, since petitioner's statement otherwise would have been admissible to impeach petitioner's testimony).

In the present case, the record supports the trial court's implicit finding[16] that Petitioner's unwarned statements to Detective Henry were voluntary and therefore admissible for impeachment.  "The test [for voluntariness] is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  Derrick v. Peterson, 924 F.2d 813, 817-18 (9th Cir. 1990), cert. denied, 502 U.S. 853 (1991) (citations and quotations omitted).  "[A] confession is only involuntary under the fourteenth amendment if the police use coercive activity to undermine

---

[16]     The presumption of correctness that federal habeas courts accord to state court findings of fact extends to implicit findings of fact.  See Knaubert v. Goldsmith, 791 F.2d 722, 727 (9th Cir.), cert. denied, 479 U.S. 867 (1986); Vasquez v. Duncan, 1999 WL 252654, at *9-10 (N.D. Cal. Apr. 21, 1999); accord Weaver v. Palmateer, 455 F.3d 958, 964 (9th Cir. 2006), cert. denied, 552 U.S. 873 (2007).

1 the suspect's ability to exercise his free will." Id. at 818; Pollard

2 v. Galaza, 290 F.3d 1030, 1033 (9th Cir.), cert. denied, 537 U.S. 981

3 (2002).  Factors to be considered include "the declarant's state of

4 mind, the physical environment in which the statement was given, and

5 the manner in which the declarant was questioned.  Pollard v. Galaza,

6 290 F.3d at 1033.[17]

7

8     Detective Henry did not coerce Petitioner's statements.

9 Detective Henry made no misrepresentations, offers, or threats during

10 the course of the interview.  See C.T. 189-212 (transcript of

11 interview).  While Petitioner was in an interview room at the police

12 department for the questioning, the physical surroundings were not so

13 uncomfortable or menacing as to be coercive.  See Pollard v. Galaza,

14 290 F.3d at 1032, 1035 (finding physical environment of police

15 interview room did not appear to be "excessively uncomfortable"); see

16 also Clark v. Murphy, 331 F.3d 1062, 1073 (9th Cir.), cert. denied,

17 540 U.S. 968 (2003) (detention in interview room for approximately

18 eight hours not coercive, where room was "unremarkable in its size and

19 nature" and petitioner made no request for food or water, or "to use

20

21     [17]     To the extent Petitioner asserts that some "third

22 party" coerced his statements and therefore those statements
   should have been excluded (Grounds 8, 9, 13), Petitioner is not

23 entitled to relief.  The Fifth Amendment privilege against self-
   incrimination does not prevent the introduction of a confession

24 coerced by a non-governmental actor.  See Oregon v. Elstad, 470

25 U.S. at 304 (the Fifth Amendment is not "concerned with moral and
   psychological pressures to confess emanating from sources other

26 than official coercion"); see also Colorado v. Connelly, 479 U.S.
   157, 167, 170 (1986) ("[C]oercive police activity is a necessary

27 predicate to the finding that a confession is not 'voluntary'
   within the meaning of the Due Process Clause of the Fourteenth

28 Amendment. . . .").

1  the facilities"). The interview, which comprises only 23 pages of

2  transcribed conversation, cannot have lasted very long. Apart from

3  Detective Henry's "simple failure" to administer <u>Miranda</u> warnings,

4  there was nothing suggestive or otherwise untoward about the

5  interview. <u>Oregon v. Elstad</u>, 470 U.S. at 310.

6

7      Because Petitioner's statements were voluntary and therefore

8  admissible to impeach Petitioner's testimony, the state courts'

9  rejection of Petitioner's <u>Miranda</u> claims was not contrary to or an

10  unreasonable application of clearly established federal law, or an

11  unreasonable determination of the facts in light of the evidence

12  presented in the state court proceedings. 28 U.S.C. § 2254(d)(2).

13  Grounds 8, 9, 13, 14, and 15 do not warrant federal habeas relief.

14

15  **III.** **Petitioner's Claim that He Was Incompetent To Stand Trial Does**

16      **Not Merit Habeas Relief.**

17

18      In Ground 25, Petitioner contends that during trial he suffered

19  from "deep, severe clinical depression which made him incompetent to

20  stand trial, unable to rationally and functionally understand the

21  charges and trial proceedings, unable to resist the domination by the

22  hostile trial lawyer, unable to exercise independent rational

23  judgment, unable to control and fire the hostile trial lawyer, who was

24  dominating Petitioner's will and actions, and was using that

25  domination to work against Petitioner's best interests" (Pet. Att.

26  113). Petitioner alleges his condition resulted from witnessing his

27  father being killed (Pet. Att. 115). Petitioner asserts that his

28  trial counsel was told that Petitioner was incompetent, but counsel

allegedly insisted that Petitioner deny all psychological problems and go to trial (Pet. Att. 116).

A.   **Standards Governing Claims Regarding Competency to Stand Trial**

The conviction of an individual who is incompetent to stand trial violates due process.  Pate v. Robinson, 383 U.S. 375, 378 (1966); Mendez v. Knowles, 556 F.3d 757, 771 (9th Cir.), cert. denied, 130 S. Ct. 509 (2009); United States v. Loyola-Dominguez, 125 F.3d 1315, 1318 (9th Cir. 1997); Hernandez v. Ylst, 930 F.2d 714, 716 (9th Cir. 1991). Competency to stand trial requires that the defendant have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense."  Drope v. Missouri, 420 U.S. 162, 171 (1975); see also Indiana v. Edwards, 554 U.S. 164, ___, 128 S. Ct. 2379, 2383 (2008) (restating standard); Huu Thanh Nguyen v. Garcia, 477 F.3d 716, 724 (9th Cir.), cert. denied, 552 U.S. 846 (2007) (same).  Where a genuine doubt exists as to a criminal defendant's competence to stand trial, procedural due process requires that a trial court conduct a hearing on the defendant's competency.  Drope v. Missouri, 420 U.S. at 172; Pate v. Robinson, 383 U.S. at 385-86; see also Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010); Huu Thanh Nguyen v. Garcia, 477 F.3d at

34

1  725.[18]

2

3      Given the fact that the trial court did not hold any hearing on

4  the issue of Petitioner's competence, this Court must determine

5  whether the evidence of incompetence was such that a reasonable judge

6  would have a genuine doubt concerning the defendant's competence.  See

7  Maxwell v. Roe, 606 F.3d at 568; Chavez v. United States, 656 F.2d

8  512, 515-16 (9th Cir. 1981).  Such a doubt arises only when there is

9  "substantial evidence" of incompetence.  Davis v. Woodford, 384 F.3d

10  628, 644 (9th Cir. 2004), cert. dismissed, 545 U.S. 1165 (2005);

11  Chavez v. United States, 656 F.2d at 517.

12

13      By itself, evidence that an accused suffers from a mental

14  illness, such as depression, does not generate a real, substantial and

15  legitimate doubt as to the accused's competence.  See Boyde v. Brown,

16

17      [18]    Similarly, California Penal Code section 1368 provides,

18  in relevant part:

19          (a) If, during the pendency of an action and
           prior to judgment, a doubt arises in the mind of the
20          judge as to the mental competence of the defendant, he
           or she shall state that doubt in the record and inquire
21          of the attorney for the defendant, whether in the
           opinion of the attorney, the defendant is mentally
22          competent. . . .

23          (b) If counsel informs the court that he or she
24          believes the defendant is or may be mentally
           incompetent, the court shall order that the question of
25          the defendant's mental competence is to be determined
           in a hearing. . . .
26

27  See Cal. Penal Code § 1368 (emphasis added).  In Petitioner's
    case, neither the trial court nor counsel expressed any doubt as
28  to Petitioner's competency to stand trial.

1  404 F.3d 1159, 1166 (9th Cir. 2005) (noting that the petitioner's

2  problems, which included symptoms of major depression, did not give

3  rise to a substantial doubt about whether the petitioner was competent

4  to stand trial; no reasons were given to explain how such symptoms

5  could impede the petitioner's ability to understand the proceedings

6  against him and to assist in his defense); Davis v. Woodford, 384 F.3d

7  at 646 (noting that while Davis may have been depressed, his history,

8  statements and conduct did not approach the overwhelming indications

9  of incompetence present in Pate, Odle v. Woodford, 238 F.3d 1084,

10 1089-90 (9th Cir. 2001), and Torres v. Prunty, 233 F.3d 1103, 1105

11 (9th Cir. 2000), where each of the defendants in those cases had

12 suffered head trauma, Odle had subsequent psychiatric hospitalizations

13 and bizarre behavior, and Torres had been diagnosed with severe

14 delusional (paranoid) disorder and made disruptive outbursts in

15 court); compare Maxwell v. Roe, 606 F.3d at 568-71 (finding a

16 reasonable doubt as to competence where the petitioner:

17 (1) continually disrupted the trial until he was removed from the

18 courtroom; (2) had been prescribed psychiatric medication which he

19 refused to take; (3) had assaulted another inmate with a knife;

20 (4) displayed irrational and paranoid behavior; (5) refused to listen

21 to the trial proceedings; and (6) attempted to kill himself during the

22 trial); McMurtrey v. Ryan, 539 F.3d 1112, 1126 (9th Cir. 2008)

23 (finding a reasonable doubt as to competence where the petitioner:

24 (1) was prescribed a variety of anti-anxiety medications; (2) had been

25 hospitalized for a suicide attempt; (3) suffered from a major

26 depressive disorder; (4) was physically ill and showing increasingly

27 volatile and aggressive behavior while in jail; (5) made incoherent

28 statements at sentencing, coupled with defense counsel's expressed

1  concern over petitioner's medication acting as a "chemical straight

2  jacket").

3

4  **B.** **Petitioner Has Not Met His Burden of Presenting Evidence to**

5  **Cast Doubt on His Competency to Stand Trial.**

6

7      As discussed below, the record belies Petitioner's allegation

8  that he was incompetent to stand trial.  The record demonstrates that

9  Petitioner was actively and competently involved in his defense from

10  beginning to end.

11

12      Petitioner manifested active involvement in voir dire

13  proceedings.  See, e.g., R.T. 321 (counsel requesting during voir dire

14  that the interpreter explain to Petitioner what "for cause is" in

15  Lithuanian); R.T. 305, 321 (reflecting conferences between Petitioner

16  and his counsel).  Petitioner appropriately answered questions put to

17  him by the Court.  See, e.g., R.T. 1608, 1864, 2105-06.  Petitioner

18  testified coherently and at great length (R.T. 1659-2126).  During the

19  prosecutor's closing argument, Petitioner said he could not see well

20  enough from his vantage point, so the Court permitted a repositioning

21  of Petitioner's chair (R.T. 2756).  After verdict, Petitioner fired

22  his trial counsel and retained substitute counsel to prepare and file

23  a motion for a new trial (C.T. 295-99; R.T. 3601-02 (Petitioner's

24  motion to substitute counsel)).  After the trial court denied

25  Petitioner's new trial motion based on the missing trial transcripts

26  (R.T. 9905-06), Petitioner's substitute counsel prepared a writ for

27  review by the Court of Appeal, which Petitioner refused to sign

28  because Petitioner "disagree[d] with some of the points" (R.T. 10202-

1  03, 11102, 11108).  Instead, Petitioner wanted to proceed on his writ

2  pro per (R.T. 11104-05).  The trial court stated that Petitioner's

3  tactics were beginning to feel like gamesmanship, and set a date for

4  sentencing (R.T. 11104, 11108-10).  In light of the Court's ruling,

5  Petitioner changed his mind and said he wanted to proceed with counsel

6  on the writ (R.T. 11111).

7

8      As summarized in the Background section above, when the matter

9  returned for sentencing, Petitioner made a Marsden[19] motion

10  complaining that counsel had not filed a comprehensive motion for new

11  trial (R.T. 11701-07 (submitted as Pet. Ex. 25)).  Petitioner spoke of

12  the First Amendment and said he had "been silenced too long" (R.T.

13  11703).  The trial judge interrupted, saying, "I will let you say what

14  you've to say, but I'm beginning to have serious doubt about your

15  lucidity" (R.T. 11703-04).  Petitioner then complained that his

16  substitute counsel had ignored Petitioner's concerns and advice and

17  failed to produce a comprehensive motion for a new trial (R.T. 11704).

18  The trial court had Petitioner taken out of the courtroom to give

19  Petitioner a chance to "calm down" (R.T. 11711).  When court resumed,

20  Petitioner began arguing with his substitute counsel and once again

21  was removed (R.T. 11712-13).  The trial court commented, "For the

22  record, Mr. White is looking at life imprisonment for murdering his

23  father, so I can understand why he doesn't want the sentence to be

24  pronounced, but I am going to sentence him" (R.T. 11713).  The trial

25

26  _____

27      [19]   See People v. Marsden, 2 Cal. 3d 118 (1970) (trial
   court must give defendant who moves to substitute appointed
   counsel opportunity to present argument or evidence in support
28  thereof).

1  court relieved Petitioner's substitute counsel (R.T. 11713-14).

2

3      When Petitioner was brought back in to court, the trial court

4  advised that Petitioner was relieved of his substitute counsel at

5  Petitioner's request (R.T. 12001).  Petitioner thanked the court and

6  reminded the court that he was "a highly educated individual –

7  university graduate - B.S. in Business Administration, and []

8  certified public accountant" (R.T. 12001).[20]  The court then granted

9  Petitioner's request to represent himself (R.T. 12002-03).

10

11     Petitioner advised the trial court that he had filed a petition

12 for writ of prohibition and mandate with the Court of Appeal and asked

13 for a stay of sentencing, adding, "I just want to learn the right

14 process.  I want to be better than any lawyer because my life depends

15 on this" (R.T. 12004-05).  The court continued the sentencing (R.T.

16 12006).

17 ///

18 ///

19 _____

20     [20]    Petitioner added:

21     I'm quickly learning - I already know about business
       law and tax laws since I worked for Price Waterhouse
22     and other C.P.A. firms, but I am quickly learning about
       criminal law since I realize that lawyers are negligent
23     and incompetent and provide ineffective assistance of
       counsel.  ¶ And it's kind of unfortunate because we
24     have 200,000 lawyers in California according to the
       latest statistics, but it's very hard to find a good
25     lawyer.  ¶ I thought I would find - I thought I found a
       good lawyer in James Devitt.  I paid him money and he -
26     you know, he's not representing me and not returning my
       calls.
27

28 (R.T. 12002).

                                    39

1   When Petitioner later returned for sentencing, Petitioner

2   objected to the prosecution's sentencing memorandum as a "standard

3   bureaucratic memo" that assertedly did not account for the

4   circumstances of Petitioner's case, and argued that his trial counsel

5   had been incompetent (R.T. 12301-07). The trial court continued

6   sentencing because the probation report had not been filed (R.T.

7   12307-08). At Petitioner's later sentencing, Petitioner advised the

8   court that he had filed a petition with the Court of Appeals three

9   days earlier, and requested another continuance of sentencing (R.T.

10   12601-02).[21] When the trial court denied Petitioner's request,

11   Petitioner moved for a new trial based on the grounds stated in

12   _____

13   [21]   Petitioner argued:

14   This is not stalling tactics. I am working under harsh
     conditions in jail. I had a post-trial lawyer who was
15   negligent, incompetent and ineffective. He was given
     nine months to prepare, you know, the petition for writ
16   of mandate. There were continuances and stipulations
     by your colleagues where he was given month after month
17   of continuance, and he was negligent. He didn't
     produce a petition that was acceptable or could be
18   verified, and I am working under very harsh conditions.
     I just got pro per status a month ago, and I already
19   produced the petition, and, you know, it just seems as
     though this is a denial of my right to self-
20   representation, and denial of equal protection of law
     and the due process. [] And my right to – under the
21   First Amendment of the Constitution to petition the
     government for redress of grievances. . . . I think
22   this is a very important issue that I think should be
     considered by the Court of Appeal, and you yourself
23   stated several times that you thought it was worthy of
     the Court of Appeal attention and you were giving
24   continuances, you know, for the negligent and
     ineffective lawyer. I am diligent.
25

26

27   (R.T. 12603-04). The trial court noted that it never made a
     finding that Petitioner's counsel was negligent or ineffective
28   and denied Petitioner's request for a continuance (R.T. 12604).

1   Petitioner's written "summary" motion filed with the trial court

2   (R.T. 12604-06).   Petitioner requested a continuance so that he could

3   prepare the "memorandum of points and authorities[,] supporting

4   declarations and all the details" (R.T. 12606-07).

5

6       Petitioner, then two-and-a-half years post-conviction, explained

7   his failure to present the facts earlier, stating:

8

9       I was in a deep depression, shock, and I was manipulated by

10      my lawyers, and I believed in my lawyers, and they – they

11      basically didn't do their job.   That's why I fired them and

12      I just started doing my work as of, you know, as of March –

13      as of March 4th, and I just recovered my ability to think,

14      and overcome my depression to religious conversation and

15      spiritual healing as of the beginning of this month, so –

16      this year, so, please, Your Honor, I am asking for fairness

17      and just, sir, please give me time to prepare all the

18      details, and I will submit everything, and then you can make

19      and the Deputy District Attorney can make your evaluation

20      and decision based on the proper details, not on the

21      summary.

22

23   (R.T. 12608).   The trial court denied a continuance and denied

24   Petitioner's motion for a new trial (R.T. 12609 (noting, "I believe

25   you are an extremely manipulative person.   You are attempting to

26   manipulate the system.")).   When the trial court was pronouncing

27   Petitioner's sentence, Petitioner interrupted to make a motion "for

28   coram nobis based on the important evidence that proves that I am

1 actually, factually and legally innocent in this case" and for an
2 arrest of judgment (R.T. 12610-11).  The trial court denied that
3 motion (Id.). Petitioner also moved to disqualify the trial judge "for
4 actual bias and prejudice" (R.T. 12611).  The trial court denied that
5 motion as well (Id.).  After Petitioner made several more statements
6 proclaiming his innocence, the trial judge sentenced Petitioner (R.T.
7 12611-19).[22]

8

9        As summarized above, apart from the trial court's single,
10 possibly sarcastic comment concerning Petitioner's lucidity when
11 Petitioner was making his post-conviction Marsden motion, there is no
12 evidence the trial court questioned (or should have questioned)
13 Petitioner's competence to stand trial.  No medical evaluation of
14 Petitioner appears in the record.  While Petitioner twice was removed
15 from court to "calm down" following his post-conviction Marsden
16 motion, the record shows that Petitioner understandably was concerned
17 with sentencing because he knew he was facing imprisonment for life.
18 Throughout the proceedings, Petitioner appeared to understand the
19 nature of the proceedings against him.  Petitioner not only was able
20 to assist in his defense, but he was able to represent himself after
21 counsel was relieved.  Moreover, a review of the record tends to
22 confirm the accuracy of the trial court's observation that Petitioner
23 is "an extremely manipulative person . . . [who was] attempting to

24 _____

25        [22]   In Ground 36, Petitioner asserts that the trial judge
was biased for denying various motions Petitioner made as the
26 judge was pronouncing Petitioner's sentence (Pet. Att. 147).  As
discussed in section V below, the Court has reviewed the entire
27 record and has discerned no evidence of bias.  Nor does the Court
find that the trial judge prejudicially erred in denying these
28 ill-defined motions.

1  manipulate the system."

2

3       No evidence in the record suggests that Petitioner lacked

4  understanding of the nature of the proceedings against him or was

5  unable to assist counsel in defending the case.  No evidence in the

6  record would have caused a reasonable judge to doubt Petitioner's

7  competency.  Moreover, as discussed above, the record affirmatively

8  reflects Petitioner's undoubted competency.  The state courts'

9  rejection of Petitioner's competency-related claims was not contrary

10  to or an unreasonable application of clearly established federal law,

11  or an unreasonable determination of the facts in light of the evidence

12  presented in the state court proceedings.  28 U.S.C. § 2254(d)(2).

13  Ground 25 does not warrant federal habeas relief.

14

15  IV.  **Petitioner's Claims of Trial Court Error Do Not Merit Habeas**

16       **Relief.**

17

18       In Grounds 31 through 37, Petitioner contends that the trial

19  court made numerous errors which assertedly deprived Petitioner of due

20  process and a fair trial.  For Petitioner to prevail on these claims,

21  he must show that the alleged errors, either singly or in combination,

22  had a "substantial and injurious effect or influence" on the

23  proceedings or verdict.  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir.

24  2007) (citing, inter alia, Brecht v. Abrahamson, 507 U.S. 619 (1993)

25  and Chambers v. Mississippi, 410 U.S. 284, 290 n.3, 298, 302-03 (1973)

26  (combined effect of individual errors can violate due process)); see

27  also Fry v. Pliler, 551 U.S. 112, 119-20 (2007) (federal courts are to

28  apply Brecht standard of review in assessing prejudicial impact of

43

1    trial-type federal constitutional error at state court criminal

2    trials).  However, absent a finding of error, there is nothing for the

3    court to accumulate.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th

4    Cir. 2002) ("Because there is no single constitutional error in this

5    case, there is nothing to accumulate to a level of a constitutional

6    violation").  As discussed below, Petitioner's contentions, considered

7    either singly or in combination, fail to meet the Brecht standard for

8    relief.

9

10       A.    **Petitioner's Contentions Concerning the Trial Court**

11             **Transcript Do Not Merit Habeas Relief.**

12

13       Petitioner contends that the trial judge knowingly allowed an ill

14   court reporter to record Petitioner's trial court proceedings,

15   assertedly depriving Petitioner of a complete and reliable trial

16   transcript (Petition, Grounds 32, 33, and 34).  Petitioner also

17   contends that, because the trial transcript was incomplete, the trial

18   court should have granted Petitioner's motion for new trial (Petition,

19   Ground 35).[23]

20   _____

21

22       [23]   To the extent Petitioner may claim that the trial court
     erred under state law in not granting his new trial motion,
     Petitioner is not entitled to habeas relief.  "In conducting
23   habeas review, a federal court is limited to deciding whether a
     conviction violated the Constitution, laws, or treaties of the
24   United States."  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  "A
     mere error of state law . . . is not a denial of due process.
25   The Due Process Clause . . . safeguards not the meticulous
     observance of state procedural prescriptions, but the fundamental
26   elements of fairness in a criminal trial."  Rivera v. Illinois,
     129 S. Ct. 1446, 1454 (2009) (internal citations and quotations
27   omitted).  Accordingly, the Court reviews Petitioner's claim as a
     due process claim.
28

44

1    Petitioner alleges that an ill court reporter, Richard Motzkus,

2   was recording Petitioner's trial proceedings on October 15, 17, 18, 21

3   and 22, 2002 (Pet. Att. 135; see also Respondent's Lodgment 2, vol. IX

4   (Reporter's Certificate by Marcetta Ponzio noting same)).   After

5   Petitioner's conviction, Motzkus was unable to transcribe his notes,

6   so the trial judge ordered another court reporter to reconstruct as

7   much of the trial proceedings for those days as possible (Pet. Att.

8   135, 138).   Petitioner claims the trial court erred in ordering the

9   reconstruction and in later dismissing the purported testimony of

10   Petitioner's trial counsel that the reconstructed transcript was

11   missing "large, extensive and crucially important portions of the

12   trial record" (Pet. Att. 141).

13

14       1.    **Trial Court Proceedings Related to the Transcript Issue**

15

16    Following the verdict, the trial court granted Petitioner's

17   motion to substitute counsel (C.T. 295-300; R.T. 3601-02).   When

18   Petitioner returned for sentencing on January 13, 2003, Petitioner's

19   new counsel had not received transcripts from the trial proceedings

20   and was granted a continuance to obtain the transcripts (C.T. 301;

21   R.T. 3901-02).   On May 14, 2003, after three subsequent hearings (R.T.

22   4501-03, 4801-04, 5101-06), the trial court issued an order for the

23   court reporter, Rick Motzkus, to appear at the next hearing to show

24   cause why he should not be held in contempt for failing to produce his

25   paper notes for October 21, 2003, so the trial transcript could be

26   completed (C.T. 302-06; R.T. 5403).   Motzkus had been hospitalized

27   sometime after Petitioner's trial, and was unable to prepare the

28   transcript himself, so another court reporter eventually prepared

1    transcripts for Motzkus' portions of the trial (R.T. 4501-02, 5101-

2    02).[24]  At the next hearing, a representative from the court

3    reporter's office stated that Motzkus' notes for a missing day had

4    been received and declared unreadable by the office, and that Motzkus

5    was too ill to transcribe his notes for the missing day (C.T. 308;

6    R.T. 5702).  The trial court ordered the reporter's office to try to

7    produce a usable transcript (R.T. 5707-10 (noting, "if the court

8    reporters cannot produce a transcript, I think [Petitioner] is

9    entitled to a new trial"); see also R.T. 6008-11 (court ordering

10    further time for the court reporters and trial counsel to work

11    together to complete the transcript)).

12

13        On July 1, 2003, Petitioner's counsel filed a motion for a new

14    trial, arguing that the missing trial transcript prevented him from

15    preparing an effective new trial motion (C.T. 308A-G).  Counsel

16    claimed that the transcript for October 21, 2002 could not be

17    transcribed (C.T. 308C).  On that day, eight witnesses testified for

18    the prosecution:  Stephen Scholtz, a medical examiner with the

19    Coroner's Office; Steven Dowell, a tool mark analyst with the

20    Coroner's Office; Robert Keil, a blood spatter analyst with the Orange

21    County Sheriff's Department; Freddie Moore, Tammy Klein, and George

22    Hou, criminalists with the Los Angeles County Sheriff's Department;

23    Stanley Hubbard, a private physician; and John Henry, a detective with

24    the Santa Monica Police Department (Respondent's Lodgment 2, vol. IX

25    (index of witnesses); C.T. 308J)).

26

27       [24]   Contrary to Petitioner's allegations, the trial court
was unaware until long after trial that Mr. Motzkus may have been

28    very ill during trial (R.T. 7805, 9456).

1    By September 12, 2003, the transcript had been completed except

2    for blanks on pages 1217, 1253, 1255-62, 1266, 1280, 1282, 1289, and

3    1359 (R.T. 6302-03).   The trial court ordered counsel to confer at

4    that point to see if they could settle the transcript (R.T. 6304).

5    When the parties returned on October 17, 2003 to settle the

6    transcript, they represented that the only portion of the transcript

7    in dispute was the blood spatter expert's testimony on October 21,

8    2002 (R.T. 6601-02).   The court ordered the parties to confer further

9    on the missing portions of the transcript and return with Petitioner's

10   trial counsel for the next hearing (R.T. 6603-04).

11

12   By the time the parties returned on May 14, 2004, Robert Keil,

13   the blood spatter expert, had filled in the blanks in a substantial

14   portion of his testimony (R.T. 8102-03, 8702-04, 8707-08, 8717).

15   Petitioner's trial counsel, Mr. Alex, testified that he thought the

16   blanks in Keil's testimony had not been filled in properly (R.T.

17   9303).   Mr. Alex also said he thought there had been more testimony

18   than the testimony reflected in the transcript (R.T. 9305).

19   Petitioner's other trial counsel, Mrs. Alex, testified she thought

20   there were inaccuracies in Mr. Keil's transcribed testimony, such as

21   the references to "bleeding wounds" (R.T. 9306).   She reportedly

22   believed that the size of the spaces in the reconstructed transcript

23   had nothing to do with the amount of testimony that was missing (R.T.

24

25

26

27

28

1   9306).[25]

2

3        The trial court reviewed the reconstructed transcript and issued

4   a tentative ruling, indicating that the court was inclined to grant

5   Petitioner's motion for a new trial (R.T. 9452-55 (summarizing the

6   post-trial proceedings to date), 9601-02).  The court stated that a

7   "fairly substantial chunk" of Keil's testimony could not be

8   reconstructed – testimony that was "central" to "refuting a key theory

9   of the defense" concerning the way the defense said the physical

10  altercation between Petitioner and his father happened (R.T. 9454-55,

11  9602).

12

13       At the final hearing on the matter, however, the trial court

14  apparently reconsidered and denied the new trial motion, finding that

15  the reconstructed transcript was sufficient (C.T. 323; R.T. 9904-05).

16  The court explained that, at the time of the tentative ruling, the

17  court had not remembered that Keil testified twice at trial -- during

18  the prosecution's case-in-chief and later on rebuttal (R.T. 9609).

19  Upon reviewing Keil's testimony in total, the court determined that

20  the available transcript covered everything to which Keil had

21  testified, such that the still missing portions of the transcript were

22  not material (R.T. 9901, 9904-05).  The trial court denied

23  _____

24       [25]    The record belies Petitioner's characterization of
    counsel's testimony.  Petitioner's trial counsel did not testify
25  that the reconstructed transcript was missing "large, extensive
    and crucially important portions" (Pet. Att. 141).  Mr. Alex
26  simply testified that he believed the reconstructed transcript
    had "much better answers" than when counsel heard them originally
27  (R.T. 9303).  The trial court disagreed with Mr. Alex's
    assessment of the transcript based on having heard the same
28  testimony during trial (Id.).

1 | Petitioner's motion for reconsideration (C.T. 325; R.T. 10201-02).

2

3 |         **2.   The Court of Appeal Decision**

4

5 |     The Court of Appeal denied Petitioner's due process claim in a

6 | reasoned decision, finding that the reconstructed transcript was

7 | adequate to permit meaningful appellate review (Respondent's

8 | Lodgment 6 at 11-13).   In finding the record sufficient to review

9 | Petitioner's claims, the Court of Appeal observed:

10

11 |         Keil's blood spatter testimony was important, establishing

12 |         that [the victim's] body could not have been where it was

13 |         found when the mortal wounds were inflicted and that

14 |         [Petitioner's] version of the events was untrue.   But

15 |         [Petitioner] does not suggest how a full transcription of

16 |         Keil's testimony would benefit him.   He fails to allude to

17 |         any errors of admission or exclusion of evidence or to

18 |         anything else in that testimony that would likely have

19 |         affected the verdict or provided a basis for a motion for

20 |         new trial.

21

22 |         It does not even appear that [Petitioner's] counsel

23 |         viewed Keil's cross-examination testimony as significantly

24 |         beneficial, as he failed to even refer to it in closing

25 |         argument.   Had significant evidence been elicited in cross-

26 |         examination, it would likely have been highlighted in

27 |         closing.   Additionally, Keil's conclusion that the crime

28 |         scene was staged was supported by other substantial

(2) the availability of alternative devices that would fulfill the same functions as the transcript." Britt v. North Carolina, 404 U.S. at 433-34.  Indeed, the Supreme Court has never held that due process requires a full verbatim transcript for effective review, or that an incomplete transcript in itself warrants relief.  Rather, the state must provide only a "record of sufficient completeness."  See Mayer v. City of Chicago, 404 U.S. 189, 194, 198 (1971) (citing Draper v. Washington, 372 U.S. 487, 495-96 (1963)).

The Ninth Circuit has held that the Britt criteria apply in evaluating a habeas petitioner's claim that the reconstruction of unrecorded portions of state trial court proceedings prevented a petitioner from making an effective appeal.  See Madera v. Risley, 885 F.2d 646, 648 (9th Cir. 1989) (adopting Britt standard while noting: "There is no Supreme Court or Ninth Circuit authority on the due process implications of a state court's failure to record portions of a criminal trial.").  Petitioner bears the burden of establishing prejudice from the lack of a transcript in light of the alleged value of the transcript and the availability of alternatives.  Id. at 649; see also Mitchell v. Wyrick, 698 F.2d 940, 941-42 (8th Cir.), cert. denied, 462 U.S. 1135 (1983) (lack of a complete record does not amount to a denial of due process without a showing of prejudice).

### 4.   **Petitioner Has Not Shown that He Was Prejudiced from the Lack of a Complete Transcript.**

Petitioner does not allege how he was prejudiced from not having the complete trial transcript, other than vaguely asserting he was